UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STEWART D. BROWN,

    Plaintiff,

v.                                  Case No. 19-cv-1761-bhl

WILLIAM KELLEY, et al.,

    Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      Plaintiff Stewart Brown is representing himself in this 42 U.S.C. §1983 action. Although he is no longer incarcerated, Brown was confined at the Kettle Moraine Correctional Institution during the events at issue. He sues Defendants Dr. William Kelley, Advance Practice Nurse Prescriber Tracy Thompson, and Nurse Anne Reilly based on allegations that they delayed ordering an MRI to diagnose his knee pain. On October 13, 2021, Defendants filed a motion for summary judgment, which is fully briefed and ready for the Court's decision. The Court will grant Defendants' motion and dismiss this action.

### BACKGROUND

      On November 29, 2018, Dr. Fuller (not a Defendant) completed an intake physical of Brown at Dodge Correctional Institution. Brown complained of ongoing left knee pain following a fall. Dr. Fuller ordered x-rays of the knee, which showed moderate osteoarthritis and no fracture, dislocation, or joint effusion. According to Brown, Dr. Fuller ordered an MRI to be scheduled to determine whether Brown had any soft tissue injuries. Dkt. No. 35 at ¶¶7-8; Dkt. No. 43 at 1; Dkt. No. 44 at ¶10.

Before the MRI happened, Brown was transferred from Dodge to Kettle Moraine. NP Thompson examined him on January 22, 2019 to address skin legions. Brown also told her about his prostate cancer condition. NP Thompson did not treat Brown's knee pain at this visit. A few days later, on January 25, 2019, Brown had an appointment with Dr. Kelley, during which Brown stated he wanted an MRI for his knee. Dr. Kelley decided to prioritize Brown's prostate cancer before aggressively treating his knee pain. According to Dr. Kelley, his concern was that Brown's prostate cancer may have metastasized to multiple bony sites, including Brown's knee. Dr. Kelley explains that, if metastatic cancer was the basis of Brown's pain, then a specific workup of Brown's knee pain would be a lesser priority to treating the cancer. In the meantime, Dr. Kelley ordered Brown to be assessed for a knee brace with physical therapy to address the knee pain. Dkt. No. 35 at ¶¶11, 13-14.

Less than a week later, Dr. Kelley and NP Thompson saw Brown in response to several health services requests wherein Brown complained about a lack of pain medication. Brown was receiving ibuprofen, but he stated it was ineffective. He inquired about getting hydrocodone for his pain, mentioning that he had been receiving that for his knee pain prior to his incarceration. Dr. Kelley again explained that the status of Brown's cancer was unknown, and he was uncomfortable providing more aggressive treatments until he knew if Brown's cancer had spread. Dr. Kelley also suspected that Brown was trying to get narcotics/opioids prescribed for his pain, which is not uncommon with prisoners. According to Dr. Kelley, he did not believe narcotic pain relief was appropriate because there are safer alternative pain medications. He also notes that physicians must be careful when treating patients with narcotics because of the harmful effects of chronic narcotic use for non-cancerous pain. Dr. Kelley decided to prescribe Duloxetine, which

is an antidepressant that is also often helpful in managing chronic pain and is commonly used in the prison setting. Dkt. No. 35 at ¶¶ 15-22.

The January 31, 2019 visit was the last time Dr. Kelley treated Brown for his knee pain, but he did meet with Brown on February 11, 2019 to assist Brown with obtaining his previous medical records. According to Brown, Dr. Kelley asked him about his knee, and Brown told him it still hurt, but not as bad. Dr. Kelley retired on April 15, 2019. Dkt. No. 35 at ¶¶23-24; Dkt. No. 44 at ¶23.

On April 8, 2019, NP Thompson, who took over Brown's care as a result of Dr. Kelley's retirement, responded to a health services request in which Brown demanded he undergo an MRI. NP Thompson informed Brown that an MRI is typically considered after a course of physical therapy, which she asserts is standard practice in the medical community. NP Thompson ordered physical therapy for Brown, and Brown started on April 25, 2019. Brown told the physical therapist that his pain was 15/10, so she ordered a TENS unit to help with the pain, which Brown asserts "helped a little." On May 8, 2019, Brown reported that his knee had given out and that he was in too much pain to continue with physical therapy. Brown's prescription for Duloxetine was also discontinued at his request because it was no longer helping his pain. Dkt. No. 35 at ¶¶25-29; Dkt. No. 44 at ¶¶27-29, 47.

Dr. Kelley was replaced by Dr. Hoftiezer. He began part-time at Kettle Moraine in September 2019, about five months after Dr. Kelley retired. Dr. Hoftiezer began working full-time in January 2020. As such, from April through August 2019, NP Thompson was the only advance care provider at Kettle Moraine. During that time, it took longer to schedule appointments, and medical concerns such as Brown's knee pain were last priority for appointments because those conditions are chronic and non-emergent. To help with triaging patients during that

time, inmates first saw a nurse who would then determine whether to refer an inmate to NP Thompson. Dkt. No 35 at ¶¶36-38.

During June 2019, Brown submitted three health service requests about his knee pain. According to Defendants, Brown refused to see the nurse on June 17 and 22, 2019 because he wanted to see a doctor. On June 18, 2019, Brown was seen during a nurse sick call. He was scheduled to see NP Thompson for complaints of chronic pain, but his appointment was a lower priority because it was non-emergent, so it was scheduled for August 2019. As his appointment neared, Dr. Hoftiezer was set to begin soon, so a scheduler in the health services unit rescheduled Brown's appointment to be with Dr. Hoftiezer. Brown filed a health services request about his knee pain in July and in September. On November 15, 2019, Dr. Hoftiezer evaluated Brown's knee. Dr. Hoftiezer suspected internal derangement of the knee and ordered an MRI. Dkt. No. 35 at ¶¶39-44.

The MRI revealed a tear of the medial meniscus, chondromalacia, and mild degenerative bone marrow edema. Dr. Hoftiezer referred Brown to Dr. Luke Fraundorf, an orthopedic specialist. Dr. Fraundorf diagnosed Brown with severe arthritis and discussed treatment options including ice, anti-inflammatories, activity modification, therapeutic exercise, brace, injection, and surgery. Brown refused surgical intervention and ultimately received a steroid injection and a brace. Dkt. No. 35 at ¶¶45-46. Neither party states whether the injection helped to alleviate Brown's pain.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might

affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Brown asserts that Defendants violated his constitutional rights when they delayed ordering an MRI to diagnose the cause of his knee pain. For the reasons explained below, Defendants are entitled to summary judgment and this action will be dismissed. "[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)). Defendants do not dispute that Brown's severe knee pain

5

qualifies as an objectively serious medical condition.  Accordingly, the Court will focus its analysis on whether Defendants were deliberately indifferent to his knee pain when they delayed ordering an MRI to diagnose the source of his pain.

An official is deliberately indifferent if that official was aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997); *Farmer v. Brennan* 511 U.S. 825, 847 (1994).  "Something more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409.  Courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances.  *Pyles*, 771 F.3d at 409.  A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id*.  This is because "the Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) *cert. denied*, 519 U.S. 1126.

1. **Dr. Kelley is entitled to summary judgment because he was not deliberately indifferent to Brown's knee injury or pain.**

Dr. Kelley explains that when he began treating Brown in January 2019, his primary concern was the state of Brown's cancer diagnosis.  As such, he decided to first determine whether Brown's cancer was confined to Brown's prostate or whether it had metastasized to other bony areas.  He opted to delay an MRI for Brown's knee because, as he explains, if the cancer had moved to other locations in Brown's body, the pain might have been best addressed with cancer treatment rather than traditional treatment for a soft tissue injury.  By the time Brown's cancer diagnosis was confirmed, Dr. Kelley had retired and Brown's care had been transitioned to NP Thompson.

6

Brown asserts that Dr. Kelley should have followed the lead of Dr. Fuller, who had ordered an MRI while Brown was housed at Dodge. But a disagreement between two doctors on the proper course of treatment is generally insufficient to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409. Dr. Fuller opted to diagnose Brown's knee pain by ordering an MRI while Dr. Kelley opted to first confirm that Brown's knee pain was not a result of his cancer spreading. Hindsight shows that Dr. Kelley's cancer concerns were unfounded, but Brown has not provided any evidence from which a jury could conclude that no minimally competent professional would have chosen the same course of treatment under the circumstances. *See id.* Further, as the Seventh Circuit has explained, "[a]n MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" *Id.* at 411.

Importantly, Dr. Kelley was not deliberately indifferent to Brown's pain while he sought to confirm the status of Brown's cancer. Understanding from Brown that ibuprofen was insufficient to address the pain, Dr. Kelley prescribed Duloxetine, which Brown appears to concede initially helped to reduce his pain. By the time Brown informed health services that Duloxetine was no longer working, Dr. Kelley had retired. In short, Dr. Kelley exercised his medical judgment in deciding to prioritize determining the status of Brown's cancer and he provided Brown with pain medication while that determination was being made. On this record, no jury could reasonably conclude that Dr. Kelley was deliberately indifferent to Brown's knee injury and pain.

2. **Nurse Reilly is entitled to summary judgment because she lacked the authority to provide Brown with the relief he demanded.**

Brown's interactions with Nurse Reilly were very limited. In June 2019, Brown submitted three health services requests about his knee pain, demanding that an MRI be ordered. Nurse Reilly responded to two of the requests, and Brown was scheduled to see her. Nurses have no

7

authority to order an MRI or to refer an inmate to a consult with a specialist, only advance care providers have that authority. Dkt. No. 35 at ¶50. Nurses can provide heat and/or ice therapy, Tylenol, ibuprofen, and muscle rub cream. *Id.* at ¶48. According to Brown, when he saw Nurse Reilly on June 17 and June 22, he told her that he was in pain. Dkt. No. 44 at ¶49. At that time, Brown had already been prescribed ibuprofen, Duloxetine, ice, a TENS unit, and physical therapy, none of which were effective to treat his pain. Brown was clear that he wanted an MRI to be ordered, but Nurse Reilly had no authority to make such an order, so she told him that he had to talk to NP Thompson. *Id.* The next day, on June 18, 2019, Brown was scheduled to see NP Thompson.

The Seventh Circuit has explained that a Defendant "cannot be liable for denying [a prisoner] a benefit she had no power to confer." *Douglas v. Reeves*, 964 F.3d 643, 649 (7th Cir. 2020). Nurse Reilly lacked the authority to order an MRI or to refer Brown to a specialist. She also lacked authority to order pain medication stronger than Tylenol or ibuprofen, which Brown had repeatedly claimed did not help his pain. Further, he was already receiving ice, had access to a TENS unit, and declined to participate in physical therapy. Accordingly, there was no relief that Nurse Reilly could provide in response to Brown's demands for an MRI and his complaints of pain.

Finally, while Nurse Reilly did not schedule Brown to see NP Thompson when she saw him on June 17, 2019, another provider did the very next day when she saw Brown at sick call. Because of staffing shortages over which Nurse Reilly had no control, Brown did not see an advanced provider until many months later. Thus, Brown was not harmed by the one-day delay in scheduling him to see NP Thomas. Nurse Reilly is entitled to summary judgment.

3. **NP Thompson is entitled to summary judgment she was not deliberately indifferent to Brown's knee injury or pain.**

NP Thompson became responsible for Brown's care after Dr. Kelley retired in April 2019. She first treated Brown for his knee pain on April 8, 2019. Brown demanded that she order an MRI, but NP Thompson informed Brown that she wanted him to first try physical therapy to address his chronic pain, which she believed was caused by arthritis. After a few physical therapy sessions, Brown refused to continue because it was too painful to complete the sessions and it seemed to be worsening his pain. Although the physical therapy did not work, no jury could reasonably conclude that NP Thompson was deliberately indifferent to his knee pain when she sought to treat the pain with physical therapy before ordering an MRI to diagnose the source of the pain.

NP Thompson based her conclusion that the source of Brown's pain was arthritis on Brown's age, earlier x-rays, and his statements that he had been taking narcotics before his incarceration (and before his fall) to treat the pain. NP Thompson believed that Brown's condition was chronic and that the best course of action was to help him strengthen his knee and prevent further atrophy. NP Thompson may have been wrong, but no jury could reasonably conclude that her decision was not based on her professional judgment. As the Seventh Circuit has observed, "[b]y definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016).

Brown explains that, after he tried a few sessions of physical therapy, his pain increased, so he refused to go. NP Thompson learned of his decision and of his request to cancel Duloxetine because it was no longer working. In fact, Brown concedes that *no* pain medications were effective to treat his pain. Dkt. No. 43 at 2 ("Pain medications no longer worked for me.") In May 2019, NP Thompson wrote to Brown and asked him to reconsider quitting physical therapy, explaining that "[m]uscle atrophy and lack of strengthening will only worsen [the] pain." Dkt. No. 38-2 at 2. She also explained that there are limited options to treat chronic pain and told him that they would discuss alternatives to Duloxetine at their next appointment.

Unfortunately, at that time NP Thompson was the only advanced care provider for the institution. Because Brown's pain was chronic, he was prioritized lower than other emergent needs, and he was scheduled to see NP Thompson in August 2019. With Dr. Hoftiezer set to start in September 2019, Brown's appointment was rescheduled to be with Dr. Hoftiezer. NP Thompson explains that she was not responsible for scheduling or rescheduling inmate appointments. Dkt. No. 35 at ¶41. Brown saw Dr. Hoftiezer in mid-November 2019, by which time Brown's knee had become swollen. *See* Dkt. No. 43 at 3-4. Dr. Hoftiezer ordered an MRI, which ultimately revealed a torn meniscus and severe arthritis. Brown declined surgical intervention to address the torn meniscus.

Although there was a delay between Brown informing NP Thompson that physical therapy was too painful and Dr. Hoftiezer ordering an MRI, the evidence shows that NP Thompson was not responsible for the delay. Brown presents no evidence from which a jury could reasonably conclude that NP Thompson scheduled or rescheduled his appointments or that she was aware of the health services requests that he continued to submit about his knee pain. *See Norwood v. Ghosh*, 723 F. App'x 357, 364 (7th Cir. 2018) (explaining that deliberate indifference results only

10

when delay was in control of the defendant). More to the point, Brown presents no evidence that the delay in ordering an MRI exacerbated his injury or prolonged his pain. Even assuming Brown's pain was a result of a torn meniscus and not severe arthritis, Brown declined to pursue surgery to fix the tear. Accordingly, diagnosing the source of Brown's pain did not lead to the resolution of his knee pain. He was in the same position after the MRI as he was before the MRI—having to manage chronic, severe knee pain. Thus, even if NP Thompson were responsible for the delay in Brown receiving an MRI, no jury could reasonably conclude that Brown's pain was prolonged or that his injury was exacerbated because of that delay. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). NP Thompson is entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 33) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on February 8, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.